LOVE (GRIGSBY v.). See Case No. 5,827.

## Case No. 8,548.

### LOVE v. HINCKLEY.

[Abb. Adm. 436.] [2]

District Court, S. D. New York. Jan., 1849.

PILOTS — SANDY HOOK CHANNEL — DOUBTFUL WORDS IN STATUTE—GENERAL USAGE—CRIPPLED VESSEL—REASONABLE EXTRA COMPENSATION.

1. There is no statute in force regulating the compensation payable for pilotage service rendered through Sandy Hook Channel. The former laws upon this subject reviewed.

2. Doubtful words in a general statute may be expounded with reference to a general usage; and when a statute is applicable to a particular place only, such words may be construed by usage at that place.

3. The libellants piloted a vessel partially crippled, but not in immediate peril, nor unnavigable, through the Sandy Hook Channel, and claimed extra fees, as for a vessel in distress, on the ground of usage of the port. Held, that the proofs in the cause did not authorize the court to say, that the term distress was by the usage of the port applicable to the condition of the vessel in question.

4. The proofs did not show a usage of charging and paying double fees as a legal right, even for services rendered to a vessel in distress.

5. The libellants were entitled to a reasonable extra compensation to be fixed by the court, for the increased responsibility and effort presumably incurred in consequence of the crippled condition of the vessel.

[Cited in The Cachemire, 38 Fed. 523.]

This was a libel in personam, by William Love and others, against William A. Hinckley, to recover pilotage fees, including compensation for alleged extra services, in the sum of $83.

P. Hamilton, for libellants, cited The Frederick, 1 W. Rob. Adm. 16; The Elizabeth, 8 Jur. 365; The Enterprise, 2 Hagg. Adm. 178, note; The Reward, 1 W. Rob. Adm. 174; The Elvira [Case No. 6,015]; Abb. Shipp. 563.

R. H. Ogden and G. Bowdoin, for respondent.

BETTS, District Judge. The libellants are owners of the pilot boat Mist, of this port, and are pilots engaged in the pilot service through Sandy Hook. About October 12, 1848, one of the libellants, William Love, entered on board the bark Gipsey, at sea, six miles outside of Sandy Hook, and at the request of the master, piloted her into this port. The bark at the time had lost her three upper masts. The wind was easterly and fair, and the bark was brought into port upon it, without difficulty or extra exertion on the part of the pilot.

So far the facts are agreed upon by the pleadings. The libel charges, however, that the bark had suffered other damages, and that she was in a crippled and disabled condition, and in distress. These allegations are denied by the answer. The libellants claim double the accustomed pilotage, amounting to $83, because of the crippled condition of the bark, rendering it more hazardous to navigate her, and subjecting the pilot to greater exposure and responsibility.

The answer insists that the service was no more than ordinary, that it was performed within five or six hours, without extra exertion or skill on the part of the pilot, and that he is only entitled to $41.50, the usual pilotage fees for bringing up a vessel of like draught. There is no statute in force which determines the rights of parties in cases like the present. The act of congress of 1789 (1 Stat. 54, § 4), provides, that all pilots "shall continue to be regulated in conformity with the existing laws of the states respectively, wherein such pilots may be, or with such laws as the states may respectively hereafter enact for the purpose, until further legislative provisions shall be made by congress." No further legislative provision has since been made, and the whole subject of pilot service remains a matter controlled by state laws.

Under the colonial government the business of pilotage through the channel of Sandy Hook was the subject of careful statutory regulation. Those regulations may be found in the act of 1759 (2 Liv. & S. Laws, p. 160, c. 161), which act was continued in force by the act of 1763 (Van Schaick's Laws, p. 433, c. 1215, § 2), and by the acts of 1767 (Id. p. 498, c. 1330), and 1768 (Id. p. 516, c. 1362), until 1775. This act awarded no extra compensation for services rendered to a vessel in distress; but provided that any pilot neglecting or refusing to give all the aid and assistance in his power to any vessel in distress should forfeit his office and pay a fine. Act 1789 (2 Liv. & S. Laws, p. 160, c. 161, § 4).

An early act of the state government, passed in 1801 (2 Kent & R. Laws, p. 133, § 18), and which provided for the appoint-

ment of pilots for the Sandy Hook Channel, by the harbor-master and wardens of the port, contains the earliest provision I find upon the subject of extra compensation in cases of distress, in the laws of the state. That provision is in substance, that the master or owners of the vessel in distress shall pay to such pilot as shall have exerted himself for the preservation of such ship or vessel, such sum for extra services as may be agreed upon; or in default of any agreement, such sum as the harbor-master and wardens shall determine to be reasonable. Section 18. The act of 1837 (Laws 1837, p. 168), which repealed all former laws on the subject of pilots through the Sandy Hook, prescribed a new system, intrusting the power of appointment of pilots to a board of commissioners created by the act. This statute contained, also, new provisions upon the subject of compensation, (sections 30–36,) enacting, among other things, however, that every pilot who shall have exerted himself for the preservation of any vessel in distress and in want of a pilot, should be entitled for any extraordinary services to such sum as should be agreed upon; or in case of not agreeing, as the commissioners should determine to be reasonable (section 39). It is unnecessary, however, to trace the history of the legislation upon this subject minutely, as by act of 1845 (Laws 1845, p. 30, c. 40, § 1), all laws relative to pilots, or pilots through Sandy Hook channel, are repealed; and no law upon the subject has since been enacted.

It seems, however, to be conceded upon both sides, that the usage at this port has continued to be to charge fees for pilotage in conformity with the rates established by the act of 1837, since its repeal; and that $41.50 would have been the legal charge under that act, and would be the charge as since established by usage, for single pilotage.

Upon the part of the libellants, evidence has been given showing a custom and usage, whilst the statute was in force and since, to charge double pilotage on vessels crippled and disabled. Some of the witnesses stated the custom to be, to charge the extra compensation when the vessel was in distress. There was some contrariety of opinion whether the damage which the bark Gipsey had received was to be regarded as putting her in distress; but the majority of the witnesses gave it as their judgment that she was in distress in the nautical acceptation of the term, and stated that the usage was to pay double pilotage for services rendered to a vessel conditioned as she was. Of the five pilots called by the libellants, and who testify to the usage, two had been in the commission but a short period; one for five years and the other since 1842; one other had been in service since 1834; another about thirty years. The time of service of the fifth was not stated. A member of the board of commissioners, and who for twelve years had great experience as a shipmaster and ship-owner, testified that he never knew any usage putting vessels nearly crippled on the footing of vessels in distress, and that a vessel situated as this one was, would not, as he understood the acceptation of the term among owners and masters, be deemed in distress.

All this testimony is open to two remarks. First, the period elapsed since the repeal of the law in 1845 is not sufficient to create a custom or usage in respect to this matter which shall be obligatory upon ship-owners and masters. Indeed, it is not proved that an individual case, analogous to the present in its circumstances, has occurred in this port since the passage of the repealing act. A usage in respect to mercantile transactions must be shown to be notorious, uniform, and of long continuance. 2 Kent, Comm. (6th Ed.) 260, and note.

But second, this usage to have any effect must be allowed to control or fix the interpretation of the state statutes; because the practice referred to, if not derived from, must seek its support or sanction in the provisions of section 39 of the act of 1837. There is no evidence that it preceded the enactment. A general statute may be expounded when its words are doubtful, by reference to any general usage with reference to which the law may be supposed to have been enacted. "Where the words of the act are doubtful," says Grose, J., in King v. Hogg, 1 Durn. & E. [1 Term R.] 728, "usage may be called in to explain them." In that case, which involved the construction of an act of parliament applicable to the whole kingdom, it was very properly held that, as a universal law could not receive different constructions in different towns, therefore a statute of general application could not be explained by the usage of this or that particular place. And the cases of The King v. Saltrem and The King v. Harman were cited from the early reports, as showing that it is only by a universal usage, and not by the usage of a particular place, that an act of general application could be expounded. But I should think it entirely consistent with this principle to hold, that a statute may be construed by the usage of a particular place or pursuit, when the act has relation to that place or special business.

It is not shown in this case that there is a fixed and definite sense attached by established usage at this port to the term "distress," which would include a vessel partially crippled and disabled, but in no immediate peril, and not rendered unnavigable. The witnesses examined on the stand do not concur entirely in their description of the custom or usage which they suppose prevails here. It may be considered as doubtful upon the proofs, whether it has not been the usual course for the pilot in boarding a

vessel of this port, in any way crippled or disabled, to state to her master that he should claim double pilotage for her as being in distress. In that case it might be in the option of the master to accept him or not, and if he were allowed to pilot her in, it might be understood to be by agreement for that rate of compensation, and thus bring the case within the provisions of section 39 of the state act, whilst that was in force, and applying to the customary rate of fees since its repeal.

So, had a long uninterrupted practice been shown under the state laws, to charge pilotage for every crippled vessel as for a vessel in distress, such practice would be good evidence of the true meaning of the act. McKeen v. Delaney, 5 Cranch [9 U. S.] 22. But the testimony of the two witnesses who speak most drectly in proof of a long practice, does not show that the rate was uniformly charged and paid as a legal right. The one who·speaks of thirty years' experience says, that he uniformly mentioned, on boarding the vessel, that he should claim extra pilotage; and it is to be remarked that the state acts always embodied provisions for adjusting pilotage fees when not agreed upon between the master and pilot, by the award of commissioners, by the board of wardens, or other functionaries designated in the various statutes. See the acts already referred to; also, 5 Webs. & S. Laws, 11. It certainly cannot be maintained that the testimony in the case amounts to proof of a long-continued and uninterrupted practice pursued at this port, to charge double pilotage as a legal demand in such cases as the present.

The evidence, fairly weighed, amounts to no more than this, that pilots were accustomed to claim double pilotage when they brought in vessels crippled or disabled, and that it was usually paid. By adverting to the provisions of section 39, it will be perceived, however, that the demand and payment would not necessarily import a concession that the statute gave the pilot a right to the fees; nor would it even imply that the demand was rested upon the statutory grant. Such practice, therefore, although of ever so long duration, would not furnish evidence of a customary construction of the clause upholding a right in pilots to such fees.

The section is in these words: "Every pilot who shall have exerted himself for the preservation of any vessel in distress and in want of a pilot, shall be entitled for any extraordinary services to such sum as the pilot and master, owner or consignee can agree on; or in case of not agreeing, as the commissioners shall determine to be a reasonable reward."

It is plain that to make out a title to extra reward under this enactment, not only must the pilot have exerted himself for the preservation of a vessel in distress, but also that he can only claim a compensation limited to a proper reward for his extraordinary services on the occasion. The vessel in the present case was brought into port without any uncommon efforts on the part of the pilot. Even if, therefore, she had been indubitably in a state of distress, the statute would afford no ground for a claim to extra pilotage; no extraordinary services having been rendered. No practice under the statute could be admitted as dispensing with the two fundamental conditions to the grant of fees; for this would be something quite different from interpretation; it would be allowing usage under a statute to override and annul its positive provisions. No mode of construction, not even the most solemn judicial decisions, can rightfully dispense with the plain and positive terms of a statute; and the reasonable presumption in respect to the supposed usage and custom of this port is, that it was not derived from the directions of the statute, but from its permission given to the parties to stipulate between themselves the rate of compensation, under which an express or virtual agreement between the master and pilot generally fixed the extra reward. In my opinion, no usage independent of statutory authority is proved, authorizing a charge of double pilotage in a case like the present, nor any practice under the statute giving it an interpretation which would include this demand.

There being no rate fixed by statute, of fees payable to pilots in this port, the libellants are entitled to be paid a reasonable reward for the services performed by them. The answer admits that the accustomed compensation, $41.50, for ordinary pilotage, would be a proper allowance in this case; and the consignees express a readiness to pay that sum. All the witnesses for the libellants testify, that some degree of extra care and exertion would be required in bringing in a vessel so situated, in the most favorable weather, as well as some increase of the responsibility of the pilot. For such extra liabilities he is entitled to a reasonable compensation. What amount is appropriate and proper, in such cases, it will always be difficult for the court to ascertain and determine, either by general rules or by any course of specific inquiry and adjudication, in a way likely to establish a criterion acceptable to those interested, or satisfactory to the court itself. The statute made provision for adding four dollars to the usual pilotage fees, on vessels drawing more than ten feet of water, for services rendered between the first of November and the first of April (section 36); on the presumption undoubtedly that more exertion and hazard would be incurred on the part of the pilot, in the case of such vessels, during that season. So also an addition of one quarter to the usual pilotage was allowed, where the vessel was taken charge of out of sight of Sandy Hook light-house. Section 31. These

enactments were devised with a view of adapting the compensation to the degree of risk and skill which might be demanded from the pilot; and for the want of any other acceptable guide, they may perhaps be properly referred to, as indicating the extra reward meet to be allowed for services which import a degree of care and watchfulness beyond that required in ordinary pilotage. It may be noticed, that while the addition of one fourth pilotage was awarded in a class of cases in which an extra service was of necessity rendered, the extra allowance of four dollars was based only upon a presumption, that in the special instances to which it was applied, an unusual exertion, care, or hazard would generally be incurred; and the extra sum was to be uniformly paid, although in the particular case the actual service might not have been increased. As I consider this to be a case for extra reward, only because of greater presumptive risk and exposure to the pilot in managing a crippled vessel, I shall, as a reasonable measure of the quantum meruit, apply to it the rule of increase prescribed by the statute for the class of cases, where, from general facts, a particular enhanced risk was to be presumed, and shall direct that there be added to the accustomed fee of $41.50, the sum of four dollars extra, the former statutory allowance for piloting the larger class of vessels between the first of November and the first of April. The compensation awarded to the libellants is accordingly fixed at $45.50.

The circumstances of the case, however, do not entitle the libellants to plenary costs. The respondents show fair ground for contesting the demand, and the libellants, not showing themselves entitled to more than $50, ought not to recover above summary costs.

Decree accordingly.